**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **CENTRAL REXALL DRUGS, INC.** | * | **CIVIL ACTION** |
| v. | * | **NUMBER: 17-2724** |
| **RAQUEL C. BONO, DIRECTOR DEFENSE HEALTH AGENCY** | * | **JUDGE BARBIER** |
| | * | **MAG. JUDGE KNOWLES** |
| | * * * | |

**FEDERAL DEFENDANT'S REPLY BRIEF**

**MAY IT PLEASE THE COURT:**

INTRODUCTION AND OVERVIEW

Plaintiff, Central Rexall Drugs, attempts to circumscribe the meaning of an otherwise broad provision regarding the suspension of claim processing, in a manner contrary to the purpose of the anti-fraud and abuse regulation of which it is a part. Under Plaintiff's interpretation, such a suspension of more than 18 months duration can only take place if the entity that is the subject of same is also <u>the</u> subject of a subsequent legal or administrative proceeding. Such a construction, however, fails to take into account the provision's purpose-in-being, to wit, the prevention of loss by the CHAMPUS/TRICARE program due to false or abusive <u>claims</u> that often-times arise out of complex deceptive situations. Due to the sophistication of fraudulent schemes such as the one in which Central Rexall is implicated, the Director needs more, not less latitude and discretion to be able to identify claims that are the product of same, as well as when the most opportune time to pursue a final decision on such claims without compromising related investigations and prosecutions. Because Central Rexall

1

fails to satisfy any, much less all of the three prongs for mandamus to issue, its lawsuit founders on the jurisdictional shores of the district court and should be dismissed.

<u>BRIEF RECAP OF THE DISPOSITIVE FACTS AS SUBMITTED BY PLAINTIFF</u>

In a letter dated April 24, 2015, the Director informed Central Rexall that payment for present and future claims it submitted would be suspended "due to you having dispensed compound drugs to TRICARE beneficiaries based upon prescriptions written by physicians whom we have concluded may not have established a physician-patient relationship with beneficiaries necessary to write valid prescriptions." Record Doc. # 1-1 at p. 2. The letter further explained payment of Plaintiff's claims was suspended indefinitely "because filling invalid prescriptions, regardless of your knowledge they are invalid constitutes 'abuse' as that term is defined in 32 CFR 199.9(b)." <u>Id.</u> The letter further informed Central Rexall that it may present argument and documentary evidence to the Director both in writing and/or in person within 30 days. <u>Id.</u>

Plaintiff availed itself of the opportunity to dispute the action both in writing and in person. <u>See</u> Record Doc. # 1-2 and 1-3. Their written presentation extolled Plaintiff's accreditation and staff training and even provided a "Pharmacy Flow Chart" detailing their efforts to ensure that every prescription was issued by a valid, licensed physician. Record Doc. 1-2 and 1-6 at pp. 15-16. After the in-person presentation, the Director rejected these averments as insufficient to raise a genuine dispute of material facts[1] with respect to the basis for the claims suspension:

> The Agency's action was triggered by the volume of prescriptions from physicians for patients/beneficiaries who were in different states. Since [Central Rexall] dispensed the prescriptions, it knew the physical location of the patients and it would also know the location of the physicians. <u>The presentation did not address this issue.</u> During the discussions, the question was specifically asked

---

[1] See 32 C.F.R. § 199.9(h)(iii)(B)(1).

> regarding the validation of a prescription to be filled by the pharmacy for a beneficiary by a doctor who was not licensed to practice in the state in which the beneficiary resided. The Compliance Officer for Central Rexall Drugs stated that: "Yes that prescription would be filled." This answer supports and confirms that the basis for the Agency's action was not addressed in the presentation.

DHA Letter dated December 2, 2015 (Record Doc. 1-6 at p. 21) (emphasis added). After a change of counsel, Central Rexall challenged the continuation of the suspension past the one-year mark, in response to which the Director succinctly informed Plaintiff that "pursuant to the applicable regulations, 'DHA extended the claim payments suspension period.'" Grubman Letter dated September 16, 2016 (Record Doc. 1-7 at p. 3).

The Director subsequently provided a more particularized explanation for continuing the suspension indefinitely:

> This office has now completed its review and has concluded that approximately $37,162,819.02 in claims submitted by Central Rexall Drug for TRICARE beneficiaries from January 1, 2012 to October 3, 2016 have no substantiating medical claims submitted to support that a valid doctor/patient relationship existed. Additionally, Dr. William Elder-Quintana, one of the prescribing physicians, wrote substantial numbers of prescriptions with no substantiating medical claims for prescriptions filled by Central Rexall Drug.

DHA Letter dated October 21, 2016 (Record Doc. 1-10 at p. 2) (emphasis added). The significance of this last observation was then made abundantly clear as the Director's letter further noted that in the preceding week—and just within 18 months after the suspension had been initiated—an indictment naming Dr. Elder-Quintana as part of a compound prescription kickback scheme had been unsealed. Id. This information then led the Director to pronounce that:

> For purposes of this temporary administrative action, since a large volume of compound prescription claims were submitted by Central Rexall Drug based upon prescriptions written by Dr. Elder-Quintana, his indictment and arrest are a basis for continuing the temporary suspension of claims processing. The prosecution of Dr. Elder-Quintana, by implication, involves compound prescription [sic] written directly by him and link to claims submitted by Central Rexall Drug.

3

Id. at p. 2 (emphasis added).

ANATOMY OF THE FALSE COMPOUNDING PRESCRIPTION CONSPIRACY

Since the Plaintiff saw fit to attach to its Opposition a copy of the above-mentioned indictment of Dr. Elder Quintana et al., the Director submits that a review of same will provide insight into the claim processing suspension action she took and how same is authorized under the relevant regulations. See Exhibit A to Plaintiff's Opposition, Record Doc. #10-1.

In the subject scheme there are three groups of defendants: Marketing Defendants, Physician Defendants and Pharmacy Defendants. Marketing Defendants acted as middle-men soliciting TRICARE beneficiaries to accept prescriptions for compounded pain and scar creams as participants in a sham medical study "through which individuals were paid monetary compensation in exchange for obtaining compounded drugs with their TRICARE prescription benefits." Id. at pp. 3-4; cf. p. 10. These middle-men further contracted with Physician Defendants like and including Dr. Elder-Quintana, who in exchange for between $30 to $60 for each "wrote thousands of prescriptions for compounded drugs to TRICARE beneficiaries who he never met in person, and for whom he conducted only a cursory consultation via telephone." Id. at p. 5; cf. pp. 12, 13. Although licensed only in Texas, Dr. Elder-Quintana "wrote prescriptions for TRICARE beneficiaries who resided in states where he was not licensed to practice medicine." Id. at p. 13.

Finally, come the Pharmacy Defendants who, in exchange for the allegedly false compounded prescriptions issued by Dr. Elder-Quintana et al., paid the Marketing Defendants a kickback for each. Id. at p. 6. After filling each Rx for a tube of compounded pain or burn cream, whose formulation was derived from the Marketing Defendants' research into how much

4

TRICARE would pay for certain ingredients in same through its pharmacy program administrator, Express Scripts, id. at p. 12, the Pharmacy Defendants paid the middle-men "a percentage of the gross revenue received…for claims submitted to TRICARE."[2]

Thus, a multi-faceted conspiracy between numerous parties has been charged, involving a physician provider who allegedly has written prescriptions with no substantiating medical claims across state lines for TRICARE beneficiaries with whom there was no valid patient-physician relationship, from which physician Central Rexall has submitted over $37 million in claims with the same indicators of fraud and abuse.[3] Moreover, investigations and prosecutions are continuing, including a civil one against Central Rexall by the undersigned United States Attorney for potential violations of the False Claims Act, 31 U.S.C. § 3729, *et seq*.[4]

## WHAT THE REGULATORY SCHEME SAYS—AND DOES NOT SAY

CHAMPUS/TRICARE was created to oversee the administration of a health care program for the Armed Forces, the Coast Guard, and even the Commissioned Corps of the U.S. Public Health Service and NOAA. 32 CFR 199.1. Like its government health care cousins, Medicare and Medicaid, the program's administrator, the Director of DHA, is charged with overseeing the program's integrity, and is given a broad mandate for ensuring compliance with its regulations. 32 CFR 199.1(j).

Likewise, the program defines abuse and fraud in a broad manner. 32 CFR 199.2. "Abuse" is defined as "any practice that is inconsistent with accepted sound fiscal, business or

---

[2] "In just two years TRICARE's average cost for a compound drug jumped from $192 to $2,595." Compound Drugs Fleece TRICARE, Create Deep Budget Hole, Military Advantage Blog (July 30, 2015) https://militaryadvantage.military.com/2015/07/compound-drugs-fleece-tricare-create-deep-budget-hole/
[3] More recent news accounts of this type of fraud show that the same scheme has been used against other government health care programs including Medicare and Medicaid, in addition to TRICARE. See, e.g, Two Plead Guilty in Multi-Million Dollar Compounding Pharmacy Fraud Scheme, USAO-SDMS (July 26, 2017), https://www.justice.gov/usao-sdms/pr/two-plead-guilty-multi-million-dollar-compounding-pharmacy-fraud-scheme
[4] A fact previously averred (Memo in Support, n. 3) and, although not a part of the documentation submitted by Plaintiff, was not denied in its Opposition.

5

professional practice which results in a CHAMPUS claim, unnecessary cost, or CHAMPUS payment for services and supplies that are…[n]ot…medically necessary or appropriate..or…fail to meet professionally recognized standards for health care providers." Id. Abuse also includes "deception or misrepresentation by a provider…in relation to a CHAMPUS claim." Id.

> In relevant part, "Fraud" is defined as:
>
> (1) a deception or misrepresentation by a provider, beneficiary, sponsor, or any person acting on behalf of a provider, sponsor, or beneficiary with the knowledge (or who had reason to know or should have known) that the deception or misrepresentation could result in some unauthorized CHAMPUS benefit to self or some other person, or some unauthorized CHAMPUS payment, or (2) a claim that is false or fictitious, or includes or is supported by any written statement which asserts a material fact which is false or fictitious, or includes or is supported by any written statement that (a) omits a material fact and (b) is false or fictitious as a result of such omission and (c) is a statement in which the person making, presenting, or submitting such statement has a duty to include such material fact. It is presumed that, if a deception or misrepresentation is established and a CHAMPUS claim is filed, the person responsible for the claim had the requisite knowledge. This presumption is rebuttable only by substantial evidence.

32 CFR 199.2.

Thus, it should not come as any surprise that the most extensive CHAMPUS regulation promulgated by the Department of Defense (DoD) in Part 199 is the one provided for remedying fraud and abuse. 32 CFR 199.9. Section 199.9 provides for "invoking administrative remedies…in situations involving fraud [and] abuse… ." Section 199.9(a)(1). The section further embellishes the earlier definitions of "abuse" and "fraud" in § 199.2, by adding non-exclusive lists of "situations" comprising each. Sections 199.9(b)(1)-(8) and 199.9(c)(1)-(13). Most notable for present purposes are the listings at § 199.9(c)(12) and (13):

> (12) <u>Arrangements by providers</u> with employees, independent contractors, <u>suppliers, or others</u> which appear to be designed primarily to overcharge the CHAMPUS through various means (such as commissions, fee-splitting, and <u>kickbacks</u>) <u>used to divert or conceal improper or unnecessary costs or profits</u>.
>
> (13) <u>Agreements or arrangements</u> <u>between the supplier and recipient</u> (<u>recipient could be either a provider or beneficiary</u>, including the parent, guardian, or other

6

representative of the beneficiary) <u>that result in billings or claims which include unnecessary costs or charges to CHAMPUS.</u>

(emphasis added).

As previously mentioned in Federal Defendant's Memorandum in Support (pp. 2-3), Section 199.9 provides the Director with several tools to address these situations of fraud and abuse, namely provider exclusion or suspension, § 199.9(f), the period of duration of which is determined under the factors set forth under § 199.9(g). These two provisions very clearly apply to a provider who has already been found criminally or civilly responsible for fraud or abuse under CHAMPUS or by another agency of the Federal Government, or when it is otherwise in the best interests of the program to exclude or suspend a provider. § 199.9(f)(1). Each of the sub-heads under this section address themselves to "the provider" or "a provider" who has been criminally convicted for CHAMPUS fraud (§ 199.9(f)(1)(i)(A)), or for fraud under other Federal programs (§ 199.9(f)(1)(i)(B)), or under non-Federal programs (§ 199.9(f)(1)(i)(C)), or adjudged civilly for CHAMPUS or other program fraud (§ 199.9(f)(1)(i)(D) and (E)).

By contrast, the Director's other tool, temporary suspension of claims processing, provided for under § 199.9(h), focuses on "claims" since under this remedy, the provider's culpability is still undetermined. This remedy generally "may be invoked to protect the interests of the Government for a period reasonably necessary to complete investigation or appropriate criminal, civil, and administrative proceedings"─not just CHAMPUS proceedings. § 199.9(h)(1)(i). Because provider culpability is indeterminate, the Director can impose a temporary suspension when there is "adequate evidence" that a "provider or beneficiary is submitting fraudulent or false claims or claims involving practices that may be fraud or abuse" (§ 199.9(h)(1)(ii)). "Adequate evidence" is comprised of either "any information sufficient to

7

support the reasonable belief that a particular act or omission has occurred," (§ 199.9(h)(1)(ii)(A)), or:

> (B) Indictment or any other initiation of criminal charges, filing of a complaint for civil fraud, issuance of an administrative complaint under the Program Fraud Civil Remedies Act, or issuance of an initial determination under this part for submitting fraudulent or false claims or claims involving practices that may be fraud or abuse as defined by this part, shall constitute adequate evidence for invoking temporary suspension of claims processing.

It is indeed noteworthy that, unlike § 199.9(f), neither the "information" nor the "indictment etc." in § 199.9(h)(1)(ii)(A) or (B) is provider specific.

This temporary, yet broader remedy in the Director's toolbox is couched in such indefinite terms due to the complex nature of the schemes carried out by the various types of providers, such as the compound prescription conspiracy outlined in the indictment of Dr. Elder-Quintana et al. Until the pattern and nature of such claims can be identified with exactitude, the remedy must be imposed in the widest manner possible in order to fulfil the Director's obligation of program integrity, i.e., to spare CHAMPUS/TRICARE (and the taxpayers) from losing money on bogus claims that should not be paid in the first instance.[5]

### THE DIRECTOR'S INTERPRETATION OF § 199.9(h)(1)(vi)

With the foregoing in mind, this discussion turns to the quintessential provision over which the parties disagreement revolves, to wit, § 199.9(h)(1)(vi) which defines the length of a temporary suspension of claims processing:

> (vi) A suspension of claims processing shall be for a temporary period pending the completion of investigation and any ensuing legal or administrative proceedings, unless sooner terminated by the Director, OCHAMPUS, or a designee, or as provided in this subparagraph.
>
>> (A) If legal or administrative proceedings are not initiated within 12 months after the date of the suspension notice, the suspension shall be

---

[5] As opposed to trying to recapture such monies by offset against future claims which, in the instance of Plaintiff's now defunct business, would be difficult if not impossible.

> terminated unless the Government official responsible for initiation of the legal or administrative action requests its extension, in which case it may be extended for an additional 6 months. In no event may a suspension extend beyond 18 months, <u>unless legal or administrative proceedings have been initiated during that period</u>.

§ 199.99(h)(1)(vi) (emphasis added). Plaintiff's Opposition (pp. 3-4) emphasizes the initial, term limiting language in the first portion of sub-paragraph § 199.99(h)(1)(vi)(A) and adds, as if an afterthought, an acknowledgment of the verbiage emphasized above that the temporary suspension of claims processing may, in fact, be extended for an indefinite period longer than 18 months. But in so acknowledging, Central Rexall attempts to circumscribe the phrase "legal or administrative proceedings" to only those brought against the suspended party, i.e., Central Rexall. Plaintiff's Opposition. pp. 10-11.

In keeping with the overarching purpose of Part 199.9, the Director has attached a broader meaning to the provision in question as indicated in her correspondence to the Plaintiff following its in-person presentation:

> In accordance with 32 Code of Federal Regulations 199.99(h), this temporary suspension of claims processing/payment will continue. <u>This temporary suspension will continue pending the completion of the review and auditing of the pharmacy and **associated physicians** and/or **any** ensuing legal or administrative proceedings</u>.

DHA Letter dated December 2, 2015 (Record Doc. 1-6 at p. 22) (emphasis added). As stated in Federal Defendant's Memorandum in Support (p. 8), "Defendant did not state that its investigation and possible proceedings were limited to Plaintiff, but made clear that Plaintiff's suspension was also dependent on the investigation of and ensuing proceedings against associated physicians."

Generally, courts "defer to an agency's interpretation of its own regulations absent plain error or inconsistency with those regulations." <u>Southwest Pharmacy Solutions v. Centers for Medicare and Medicaid Svcs.</u>, 718 F.3d 436, 442 (5th Cir. 2013) <u>citing</u> <u>Auer v. Robbins</u>, 519

9

U.S. 452, 461 (1997). More particularly, courts generally grant Auer deference to an agency's interpretation of its own ambiguous regulation. Delek Refining, Ltd. v. OSHRC, 845 F.3d 170, 175 (5th Cir. 2016) ("[W]e will defer to an agency's reasonable interpretation of its own regulations when the text of the regulation is ambiguous."). "In situations in which the meaning of regulatory language is not free from doubt, the reviewing court should give effect to the agency's interpretation so long as it is reasonable," and it "sensibly conforms to the purpose and wording of the regulations." Martin v. OSHRC, 499 U.S. 144, 150–51 (1991) (alterations and internal quotation marks omitted). Such deference is due even when that interpretation is "advanced in a legal brief, unless that interpretation is 'plainly erroneous or inconsistent with the regulation.'" Chase Bank USA, N.A. v. McCoy, 562 U.S. 195, 208 (2011) (quoting Auer, supra at 461). Deference is declined only if the regulation is unambiguous or if the agency's "interpretation is a novel litigating position 'wholly unsupported by regulations, ruling, or administrative practices.'" Texas Clinical Labs Inc. v. Sebelius, 612 F.3d 771, 777 (5th Cir. 2010) (quoting Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 212 (1988)).

In the case at bar, the regulation in question does not specify the party against whom administrative or legal proceedings must be brought to bring about the indefinite extension of the suspension of which Plaintiff complains. Central Rexall contends that such proceedings must have been brought against it—the suspended party—by DHA within the 18 month window in § 199.99(h)(1)(vi)(A). Plaintiff's Opposition, pp. 10-11. Plaintiff, however, points to no case on point and argues solely based on what it believes is implied by the provision. So the regulation, being susceptible of more than one meaning, meets the ambiguousness requirement.

Further following Auer analysis, Central Rexall also cannot point to any evidence that the DHA has previously applied the regulation in a manner inconsistent with its proffered

10

interpretation since this is a case of first impression. Southwest Pharmacy Solutions, supra at 442. In that case, the plaintiff, a coalition of pharmacies, brought their dispute with CMS' Preferred Pharmacy Rule in Medicare Part D coverage, which they claimed squeezed out independent pharmacies (as opposed to national chains) from participating in preferred pharmacy networks, in contravention of the requirement that Prescription Drug Plans like Part D allow insureds to fill prescriptions at "any willing pharmacy." The coalition alleged that CMS would treat their dispute as a "grievance" and thus not be subject to federal court review, as opposed to being a "coverage determination" which is reviewable. Contrary to the pharmacies' contention, CMS' director submitted a declaration in support of a motion to dismiss averring that the dispute would be construed as a coverage determination, resulting in the granting of the dismissal. The Fifth Circuit affirmed finding that even though the agency's interpretation arose, for the first time, in the midst of litigation, it was still worthy of due deference, and not to be disregarded as a "'*post hoc* rationalization advanced by an agency seeking to defend past agency action against attack.'" 718 F.3d at 442 (quoting Christopher v. SmithKline Beecham Corp., 567 U.S. 142, 155 (2012)).

The Director's interpretation was made evident long before this lawsuit. In addition to the statement quoted earlier from her December 12, 2015 letter (Record Doc. # 1-6 at pp. 21-22), and consistent with this earlier construction, the Director informed Central Rexall on October 21, 2016 following the unsealing of the charges against Dr. Elder-Quintana that "his indictment and arrest are a basis for continuing the temporary suspension [because] [t]he prosecution of Dr. Elder-Quintana, by implication, involves compound prescription[s] written directly by him and link to claims submitted by Central Rexall Drug." Record Doc. #1-10 at p. 2.

Central Rexall describes the Director's interpretation of § 199.99(h)(1)(vi)(A) as "tortured." Plaintiff's Opposition at p. 11. A closer examination of the provision in question, however, belies Plaintiff's contention. As explained *supra*, § 199.9(h) is the Director's broad administrative remedy to prevent payment of fraudulent claims in the absence of and/or prior to any determination of criminal or civil culpability, i.e., when the "situation" is still indeterminate. When faced with artful schemes such the one as described earlier, involving various providers crisscrossing the nation (and even the world, since beneficiaries live in military bases worldwide), the net must necessarily be cast wide to be effective in preempting payment of potentially invalid claims. Thus, the "adequate evidence" of fraud is not and must not be limited to the suspended provider but rather to anyone who is indicated to be a party to the conspiracy to submit fraudulent or false claims. § 199.9(h)(1)(ii)(B). Hand in glove with such an approach, the Director must then take notice of the investigation of and ensuing proceedings against associated providers like Dr. Elder-Quintanas or risk substantial fiscal loss or interference with other investigations and proceedings.

A closely analogous case is found in the area of Federal Contracting. In <u>Agility Defense & Government Svcs.</u>, 739 F.3d 586 (11th Cir. 2013), two corporate affiliates of an indicted government contractor sought declaratory and injunctive relief against the Department of Defense following their suspension under a FAR[6] which was based solely on their affiliate status. The suspension regulation in question, 48 C.F.R. 9.407-4(a) and (b), is remarkably similar to the one in the case at bar:

> (a) Suspension shall be for a temporary period pending the completion of investigation and any ensuing legal proceedings, unless sooner terminated by the suspending official or as provided in this subsection.

---

[6] Acronym for **F**ederal **A**cquisition **R**egulation.

> (b) If legal proceedings are not initiated within 12 months after the date of the suspension notice, the suspension shall be terminated unless an Assistant Attorney General requests its extension, in which case it may be extended for an additional 6 months. In no event may a suspension extend beyond 18 months, unless legal proceedings have been initiated within that period.

The central issue in the appeal was whether the United States or its agencies must initiate legal proceedings against an affiliate of an indicted government contractor to toll the 18–month time limit on the suspension of the affiliate even though the affiliate was suspended solely on account of its affiliate status. Id. at 589. The DoD asserted that "legal proceedings" can fairly be interpreted as legal proceedings against the indicted government contractor. The affiliates argued that the provision had to mean legal proceedings against the suspended affiliate of the indicted government contractor.

Reversing the district court's grant of mandamus relief and sustaining the DoD's interpretation of its FAR, the Eleventh Circuit offered the following prescient analysis:

> But the agency action before us is not a finding of present responsibility for the purpose of awarding a government contract. We are instead reviewing the suspensions of two affiliates, which all parties agree derive solely from their association with Public Warehousing following its indictment for a multibillion-dollar fraud committed against the United States. The whole text of the regulation provides that an affiliate can be suspended based solely on its affiliate status so long as the agency establishes that it is an affiliate, gives notice of the suspension, and provides an opportunity to respond to the suspension. The present responsibility of an affiliate is irrelevant.

739 F.3d at 590.

In sum, the Director submits that her interpretation that the ongoing criminal proceedings against Dr. Elder-Quintana, a known associate provider of the Plaintiff, permit her to extend the temporary suspension of claims processing past 18 months is not only reasonable, but necessary to effectuate the overarching purpose of Part 199.9 of ensuring program integrity through combatting fraud and abuse. Plaintiff was made aware of this interpretation in conjunction with the issuance of the temporary suspension; the Director's briefing herein merely embellished

rather than advanced this construction for the first time. Given the omission of "provider-specific" terminology elsewhere in the sub-part, the broad interpretation sensibly conforms to the purpose and wording of the regulation. Far from "tortured," the Director's interpretation is the only one that fulfills the purpose of Part 199.9. It is, in fact, Plaintiff's interpretation that would vitiate said purpose by allowing providers like Central Rexall to benefit from their association with other providers who are themselves the subject of legal proceedings by enabling them to obtain compensation for claims despite the existence of adequate evidence that they are likely the fruits of fraud. Just as importantly, the continued temporary suspension prevents interference with related ongoing proceedings that might otherwise be compromised by requiring DHA to prematurely issue and defend a final decision regarding such claims instead of awaiting the proceeding's outcome which denouement might ultimately be dispositive of the fraudulent nature of the suspended claims.

The Director, therefore, respectfully submits that this Court should defer to and uphold her interpretation of the temporary suspension regulation.

PLAINTIFF'S MANDAMUS ARGUMENT MISAPPREHENDS WOLCOTT, HELFGOTT

Central Rexall's argument (Plaintiff's Oppostion, n. 3) asserts that the Fifth Circuit's decisions in Wolcott I[7] and Wolcott II,[8] when read together establish a two-step process to confirm subject matter jurisdiction rather than establish same under 28 U.S.C. 1361. While this may be a distinction without a significance, it is clear that Plaintiff misapprehends the ultimate holding in the case, to wit, the difference between a discretionary act and a non-discretionary duty.

---

[7] Randall D. Wolcott, M.D., P.A. v. Sebelius, 635 F.3d 757 (5th Cir. 2011)
[8] Randall D. Wolcott, M.D., P.A. v. Sebelius, 497 Fed.Appx. 400 (5th Cir. 2012)

Wolcott, a Medicare provider of wound-care services, sought mandamus relief requiring CMS and the Medicare contractor (a/k/a the "intermediary") it employed to make reimbursement determinations, TrailBlazer, to pay the claims Wolcott had submitted. In fact, Wolcott sought 5 such orders, each one corresponding to a different reimbursement situation:

> In Count I, Wolcott asks for mandamus compelling the defendants to process and pay <u>successfully appealed claims</u> <u>in accordance with final administrative decisions</u>. In Count II, Wolcott asks for an order in mandamus compelling the defendants to timely pay Wolcott for claims after it succeeds on appeal and to implement effective processes to effectuate timely payment as required by law. In Count III, Wolcott asks the Court to order the defendants to cease denying Wolcott's new claims for reasons that have previously been held invalid in final administrative decisions and to reverse all denials predicated on such invalid reasons. In Count IV, Wolcott asks for an order in mandamus compelling the defendants to reverse prepayment-review denials made after March 21, 2009, and to remove Wolcott from prepayment review. Finally, in Count V, Wolcott asks the court to order the defendants to cease automatically denying debridement claims in excess of five per patient per year.

635 F.3d at 762 (emphasis added). The Fifth Circuit found that mandamus should have been issued only as to Count I because it involved a final decision which TrailBlazer failed to effectuate and for which there was no other avenue of relief. Id. at 769-770. Central Rexall, despite having not yet received an initial determination, much less a final decision on its claims, mistakenly asserts that it is in the same position.

However, prior to seeking mandamus, Wolcott already had in hand a final administrative decision that rendered payment of the Count 1 claims, non-discretionary. Wolcott I at 768-769. By contrast, Central Rexall is seeking "a writ…requiring [the Director] to immediately terminate the temporary suspension of claims processing and payments…and to begin processing *and paying* all claims due to Central Rexall forthwith." Complaint, "Prayer for Relief" ¶ b (emphasis supplied). Moreover, Plaintiff is asking this Court to "*declare* that the length of the temporary suspension of processing and payment of Central Rexall's claims exceeds the maximum length allowed by law." Id. at ¶ c (emphasis supplied). Thus, Central Rexall is asking the Court not

15

only to override the Director's clearly discretionary decision to continue the suspension of claim processing, but also for declaratory relief, both as to the validity of the claims[9] and the invalidity of the suspension past the 18 month mark. In this respect, Central Rexall *is* in the same position as Wolcott relative to those claims the Fifth Circuit found there was no jurisdiction under Section 1361 because "the relief sought…was declaratory and injunctive in nature." Wolcott I at 767.

Central Rexall also misapprehends the Director's reliance on Helfgott.[10] Plaintiff's Opposition (p. 13) asserts that DHA "relies heavily upon Helfgott v. United States for the proposition that it has discretion to continue the temporary suspension." The Director begs to differ. Other than citing the decision for the elements of the 3 prong test for mandamus jurisdiction (Memorandum in Support pp. 5-6, 8), the Director cited Helfgott for the principle that "The length of time determined to be appropriate for an administrative adjudication is clearly a discretionary, not a ministerial, decision of the agency, and mandamus cannot be used to regulate the exercise of discretion." Memorandum in Support at p. 9 quoting Helfgott, supra at 331. The Helfgott court also noted the difference between an appropriate request for mandamus to require an agency "to perform a ministerial duty such as accepting a claim, reviewing a claim or processing a claim" and the one before it in which Helfgott inappropriately sought "an order that the VA alter its decision…to defer a final determination on the claim until a pending appeal involving § 1151 is decided." 891 F.Supp. at 330. Thus, the Director's comparison between Helfgott and the case at bar is an apt one as Central Rexall also seeks to constrain what is a discretionary decision aimed at preventing a potential and very considerable

---

[9] § 199.9(h)(1)(i) states that "[t]he temporary suspension only delays the ultimate payment of otherwise appropriate claims." Even if the Court orders the lifting of the suspension, only those suspended claims that "are otherwise determined to be in compliance with the requirements of law or regulation, will be processed to completion and payment… ." The CHAMPUS program, however, makes those determinations utilizing § 199.7. See Argument 1.C. "Other Adequate Relief is Available" in Memorandum in Support, pp. 11-12.

[10] Helfgott v. United States, 891 F.Supp. 327 (S.D. Miss. 1994).

16

loss to TRICARE by postponing processing of claims tainted by the criminal prosecution of an associated provider of fraudulent prescriptions until said legal process comes to a conclusion.

The other reason DHA cited Helfgott was for the notion that a delay of nearly two years for the processing of claims was not so lengthy as to qualify for the extraordinary relief afforded under Section 1361. See Memorandum in Support, pp. 13-14; cf. In re Monroe Communications Corp., 840 F.2d 942, (D.C.Cir. 1988) (5 year wait for decision by applicant for TV license who sought mandamus against FCC deemed not so egregious as to warrant mandamus); Public Utility Com'r of Oregon v. Bonneville Power Admin., 767 F.2d 622 (9th Cir. 1985) (ongoing rate determination action of several years duration insufficient to warrant mandamus: "The circumstances that will justify our interference with nonfinal agency action must be truly extraordinary… .").

## PLAINTIFF HAS AN ADEQUATE REMEDY TO WHICH IT ALREADY RESORTED

Plaintiff's Opposition (pp. 15-16) not only fails to demonstrate it has no other adequate remedy, but blithely dismisses the relief to which it has already availed itself. In her Memorandum in Support (pp. 11-13), the Director posited that Central Rexall is not entitled to mandamus because other adequate relief is available to Plaintiff through the administrative remedy provided under § 199.9 (written and oral objection to the Director) and § 199.10 (administrative appeal of appealable determinations and decisions). Plaintiff dismisses the Director's argument as "disingenuous" contending Central Rexall is in "regulatory limbo" in that it has no access to any administrative appeal process to challenge the temporary suspension. Plaintiff's Opposition, p. 16.

Central Rexall, however, glosses over the fact that there is an initial remedy afforded to Plaintiff under the subject regulation—a written argument opposing the suspension with

17

information and documentation raising a genuine dispute over the material facts, as well as an in-person presentation to the Director or her designee. § 199.9(h)(1)(iii)(B)(1) and (2). As detailed earlier in this memorandum, Central Rexall availed itself of both written and oral presentations in opposition to the temporary suspension--twice, in fact.

The alternative remedy to an order of mandamus must merely be adequate, i.e., "capable of affording full relief to the very subject matter in question." Carter v. Seamans, 411 F.2d 767, 773 (5th Cir. 1969). Moreover, the alternative remedies that might call for refusal to resort to a writ of mandamus encompass judicial remedies, Carter, supra, as well as administrative ones, Tarlton v. Clark, 441 F.2d 384 (5th Cir.1971). A sampling of relevant decisional law shows that being left in "regulatory limbo" pending an appealable decision is not uncommon and the relief afforded under the alternative remedy need not be swift. See Agility Defense, supra at 591-592 (court rejected defense contractor's affiliates' assertion that the remedy afforded them under the FARs—notification of suspension and the basis therefore and an opportunity to respond—was "constitutionally dubious," especially in view of the affiliates' "fail[ure] to recognize that the agency afforded them additional process when it twice considered their request to terminate their suspensions."); Homewood Professional Care Center, LTD. v. Heckler, 764 F.2d 1242 (7th Cir. 1985) (lack of regulations providing for hearing on suspension of claim processing for fraud in lieu of final decision incident to administrative appeal not deemed mandamus-worthy due to no clear right to appeal, limbo notwithstanding).

Thus, it appears that Central Rexall's objection is not that lacks any means of appeal, but that it cannot have that appeal immediately. As the Eleventh Circuit put it, "the affiliates have conflated constitutionally adequate process with getting their way." Agility Defense, 739 F.3d at 592.

## PLAINTIFF HAS FAILED TO SATISFY THE TEST FOR MANDAMUS TO ISSUE

Like its administrative submission in response to the temporary suspension of which it complains, Central Rexall's Memorandum in Opposition fails to make the case for the extraordinary relief it seeks herein. This decades-old analysis from the District of Columbia Circuit makes readily apparent the shortfalls in Central Rexall's presentation:

> The remedy which, before adoption of the new Rules of Civil Procedure, was known as mandamus, is available under the new rules and is governed by the same principles as formerly governed its administration. Those principles may be briefly summarized as follows: (1) The writ should be used only when the duty of the officer to act is clearly established and plainly defined and the obligation to act is peremptory. (2) The presumption of validity attends official action, and the burden of proof to the contrary is upon one who challenges the action. (3) Courts have no general supervisory powers over the executive branches or over their officers, which may be invoked by writ of mandamus. Interference of the courts with the performance of the ordinary duties of the executive departments of the government would be productive of nothing but mischief. (4) When the performance of official duty requires an interpretation of the law which governs that performance, the interpretation placed by the officer upon the law will not be interfered with, certainly, unless it is clearly wrong and the official action arbitrary and capricious. (5) For it is only in clear cases of illegality of action that courts will intervene to displace the judgments of administrative officers or bodies. (6) Generally speaking, when an administrative remedy is available it must first be exhausted before judicial relief can be obtained, by writ of mandamus or otherwise.

Hammond v. Hull, 131 F.2d 23, 25 (D.C. Cir. 1942) (footnotes and citations omitted). At best, Central Rexall has raised only a dispute over how an ambiguous regulation might be construed, but that does not equate with either a clear entitlement to relief nor a clear duty to act, especially in view of the availability, albeit in the future, of administrative and judicial review. In view of the considerations listed in the excerpt above, the balance of the equities weighs heavily in favor of leaving intact the Director's imposition of a temporary suspension of processing Central Rexall's claims until the conclusion of clearly related legal proceedings whose denouement might ultimately be dispositive of the validity of said claims.

## CONCLUSION

**WHEREFORE,** for the reasons assigned above, as well as in its original memorandum in support, the United States respectfully requests that this Honorable Court grant its dispositive motion and dismiss this proceeding.

Respectfully submitted,

DUANE A. EVANS
ACTING UNITED STATES ATTORNEY

*/s/ Glenn Schreiber*
GLENN K. SCHREIBER
Assistant United States Attorney
650 Poydras Street, 16th Floor
New Orleans, Louisiana 70130
Telephone: (504) 680-3093
Fax: (504) 680-3174
Email: glenn.schreiber@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on **August 29, 2017**, a copy of the foregoing **FEDERAL DEFENDANT'S REPLY BRIEF** was filed electronically with the Clerk of Court using the CM/ECF system.

*/s/ Glenn K. Schreiber*
GLENN K. SCHREIBER
Assistant United States Attorney